# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
February 11, 2014 Session

## STATE OF TENNESSEE v. BRIAN DUNKLEY and WILLIAM MILLER

**Appeal from the Criminal Court for Davidson County**
**No. 2009B1419     Steve R. Dozier, Judge**

_____

**No. M2012-00548-CCA-R3-CD - Filed June 25, 2014**

_____

A Davidson County jury convicted Defendant Brian Dunkley of conspiracy to commit first degree murder. The jury convicted Defendant William Miller of one count of conspiracy to commit first degree murder, one count of attempted aggravated burglary, and one count of attempted first degree murder. The trial court sentenced both defendants to effective sentences of twenty-five years in the Tennessee Department of Correction. On appeal, Defendant Dunkley asserts that: (1) the trial court erred when it admitted text messages into evidence pursuant to Tennessee Rule of Evidence 404(b); (2) the trial erred when it denied his motion for new trial because the trial court failed to function as the thirteenth juror and because newly discovered evidence warranted a new trial; (3) there is insufficient evidence to support his conviction; and (4) the trial court improperly applied enhancement factors when it sentenced him. Defendant Miller asserts that: (1) there is insufficient evidence to support his convictions; (2) the trial court erred when it denied his motion for new trial because the trial court failed to function as the thirteenth juror; and (3) the trial court erred when it imposed consecutive sentences. After a thorough review of the record and applicable law, we affirm the trial court's judgments.

**Tenn. R. App. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which JERRY L. SMITH and JEFFREY S. BIVINS, JJ., joined.

Michael A. Colavecchio, Nashville, Tennessee for the appellant, William Miller.

Hershell D. Koger (on appeal), Pulaski, Tennessee, and Kara Everett (at trial), Nashville, Tennessee, for the appellant, Brian Dunkley.

Robert E. Cooper, Jr., Attorney General and Reporter; Brent C. Cherry, Senior Counsel; Victor S. Johnson, III, District Attorney General; Pamela Anderson and Rachel Sobrero,

Assistant District Attorneys General for the appellee, State of Tennessee.

## OPINION
## I. Background and Facts

This case arises from charges that the defendants entered into a conspiracy to kill the victim, Kristi Dunkley.[1]  A Davidson County grand jury indicted Defendant Dunkley and Defendant Miller for one count of conspiracy to commit first degree murder, one count of attempted aggravated burglary, and one count of attempted first degree murder.  Defendant Dunkley was additionally indicted for two counts of solicitation to commit first degree murder.[2]  The grand jury also indicted Stephanie Frame[3] and Donte Chestnut for these offenses.

At the April 2011 trial on these charges, the parties presented the following evidence: Herman Marshall testified that Mr. Chestnut was his brother-in-law and that he and Mr. Chestnut had an "unusual" telephone conversation on February 22, 2009.  He stated that Mr. Chestnut said he had something to tell Mr. Marshall that could not be said over the telephone. The two men met about a week later at Mr. Chestnut's house where Mr. Chestnut asked Mr. Marshall if he "want[ed] to make $10,000[.]"  When Mr. Marshall said "yes" and asked what Mr. Chestnut wanted done, Mr. Chestnut made a horizontal motion across his neck with his hand.  Mr. Marshall said that he interpreted this motion to mean that Mr. Chestnut wanted him to kill someone, which Mr. Marshall said to Mr. Chestnut he could not do.  Mr. Chestnut told him it was a "girl" who needed to be killed by March 6.  Mr. Marshall told his family about his conversation with Mr. Chestnut, and then he met with Mr. Chestnut to gain more information about the request.  Mr. Chestnut told Mr. Marshall that the woman who would pay him to commit the crime would provide $2,000 "up front."  After this second meeting, Mr. Marshall testified that he thought about taking the $2,000 and "running."  Mr. Marshall testified that, instead, he called Mr. Chestnut and said he would do the killing, and then he contacted police regarding these discussions.

The police asked Mr. Marshall to participate in a recorded telephone conversation

---

[1]Ms. Dunkley's name has since been changed to Kristi Alderson.  For the purposes of consistency throughout this opinion, we will address her as Ms. Dunkley

[2]Before trial, the State declared *nolle prosequi* on the two counts of solicitation of first degree murder.

[3]The indictment named "Stephanie Frame, a.k.a. Stephanie Ferguson" as a defendant in this case. Throughout the trial testimony, she was identified by both names.  For the purposes of consistency throughout this opinion, we will address her as Ms. Frame.

with Mr. Chestnut, which he did. During the recorded telephone conversation, Mr. Chestnut stated that "Stephanie" was the person who was going to pay Mr. Marshall to do the killing. The police then asked Mr. Marshall to participate in a recorded telephone conversation with "Stephanie." Mr. Marshall again agreed to help police by contacting the woman, who turned out to be Stephanie Frame. A transcript of this telephone conversation was admitted into the record as evidence. Mr. Marshall said police detectives instructed him to arrange to meet Ms. Frame and then fitted him with a recording device for the meeting.

Mr. Marshall testified that he arranged to meet with Ms. Frame in a hospital parking lot inside her vehicle. Once inside Ms. Frame's vehicle, she handed Mr. Marshall a Kroger bag containing a handgun, a body suit, a hairnet, and a can of pepper spray. She also showed him a picture on her cellular telephone of the target, Ms. Dunkley. The recording of Mr. Marshall's conversation with Ms. Frame was admitted into evidence and played for the jury. Mr. Marshall recalled that Ms. Frame gave him $200, and then drove him to Ms. Dunkley's apartment complex to show him where it was located. He told Ms. Frame he would, "get it done." Immediately following this meeting, Mr. Marshall met with the police detectives and gave them the $200.

On cross-examination, Mr. Marshall stated that he did not know Defendant Dunkley. He agreed that Mr. Chestnut never asked him "to do anything" and that Mr. Chestnut simply "told him about" doing the killing. He agreed that there was never any formal agreement between the two men about the murder of Ms. Dunkley.

On redirect-examination, Mr. Marshall agreed that Mr. Chestnut had said he wanted someone killed and had given Mr. Marshall a time frame during which it needed to be done.

Sue Johnson, a custodian of records for T-Mobile, testified that her company kept phone records in the normal course of business, and she identified a particular set of records associated with a telephone number registered to Mr. Chestnut for the dates March 1 through 4, 2009. She identified a second and third set of records associated with a telephone number registered to Ms. Frame, for the dates March 1 through 4, 2009 and February 10 through March 10, 2009. The telephone records were admitted into evidence.

Tatiana Steven testified that she was a records custodian for T-Mobile. She identified two sets of telephone records registered to Defendant Dunkley for the dates February 28 through March 2, 2009. She identified a third set of records registered to Defendant Dunkley for the dates June 7, 2008 through May 26, 2009. The telephone records were admitted into evidence.

Valinda Burks testified that she was an insurance agent for State Farm Insurance. She

testified that Defendant Dunkley and Ms. Dunkley had been clients of her agency since 2001. She stated that a "permanent life insurance policy" for $50,000 was taken out on July 19, 2006, insuring Ms. Dunkley's life and listing Defendant Dunkley as the beneficiary. She stated that the policy was "current" at the time of trial. She also stated that a twenty-year term life insurance policy, in the amount of $250,000, insuring Ms. Dunkley's life with Defendant Dunkley as the beneficiary, had been taken out with her agency but was not current. She stated that this policy had been terminated July 19, 2009. Both life insurance policies were admitted into evidence. Ms. Burks testified that Defendant Dunkley did not have a life insurance policy on himself and that he had declined to insure himself when she encouraged him to do so.

On cross-examination, Ms. Burks stated that if the beneficiary of a life insurance policy killed the insured the policy would not be paid out to that beneficiary.

On re-direct examination, Ms. Burks stated that the $50,000 and $250,000 policies were taken out on Ms. Dunkley by Defendant Dunkley, naming him as the beneficiary, and making him the "owner" of the policies. She stated that, because Ms. Dunkley was not the owner, she could not change the beneficiary.

Officer Mike Dorris, a Goodlettsville police officer, testified that, on February 8, 2009, he responded to a call at Ms. Dunkley's apartment. He stated that the front door of her apartment appeared to have been struck by a sledgehammer and that he took a report from Ms. Dunkley concerning the damage to her door. He stated that "no evidence linked anybody" to the incident.

Officer Dorris testified that Ms. Dunkley indicated to him that the damage could have been done by her "soon-to-be-ex-husband" but that she had no proof that it was him.

Detective Charles Robinson testified that he was a detective with the Metropolitan Nashville Police Department and that on March 2, 2009, he contacted Mr. Marshall about a "murder-for-hire scheme" Mr Marshall had reported to the police. Detective Robinson spoke with Mr. Marshall and asked him to wear a body wire to record any of Mr. Marshall's further conversations with the people involved in the scheme. Mr. Marshall agreed, and Detective Robinson and several other detectives went to Mr. Marshall's house to fit him with a recording device and record his telephone conversations with Ms. Frame. The detectives then followed Mr. Marshall to his meeting with Ms. Frame, which took place in a hospital parking lot. Detective Robinson testified that everything Mr. Marshall said could be heard over the wire.

Detective Robinson testified that, at the hospital parking lot, he witnessed Mr.

Marshall get inside Ms. Frame's vehicle, a green Mercury Mountaineer, then he witnessed the two leave the parking lot in Ms. Frame's vehicle. He testified that other detectives monitoring the wire told him that Ms. Frame was taking Mr. Marshall to the apartment of the woman she wanted killed. Detective Robinson waited in the hospital parking lot for Ms. Frame's vehicle to return to drop off Mr. Marshall. After Ms. Frame returned to drop Mr. Marshall off, and drove away again, her vehicle was pulled over, and she was taken into custody.

Detective Jeff Weaver testified that he worked in the surveillance investigative support unit for the Metropolitan Nashville Police Department and that he assisted with the body wire that was attached to Mr. Marshall. He also was asked by another detective to examine two cellular telephones, a G-1 T-Mobile telephone and a "Shadow phone," both belonging to Ms. Frame. From Ms. Frame's G-1 telephone, Detective Weaver extracted the telephone's contact list, call log, and text messages in "report form." The report was admitted into evidence. Detective Weaver testified that the report listed all calls and text messages received and made on the telephone beginning on January 18, 2009, and ending on March 26, 2009. He testified that this information is contained on the telephone's SIM card. From Ms. Frame's Shadow telephone, Detective Weaver was able to extract a report containing the calls and text messages received and made from the telephone, ending on March 26, 2009. The report was admitted into evidence. He testified that the SIM card was not inside the Shadow telephone, but he was still able to extract information from the telephone using a certain type of software, a "ZRT program."

On cross-examination, Detective Weaver testified that the report from the G-1 telephone listed text messages sent and received beginning on January 18, 2009, and it listed phone calls made and received beginning on February 23, 2009. He recalled that on the Shadow telephone he was only able to retrieve incoming text messages, and he could not recall whether the telephone contained any outgoing text messages. The trial court held a jury-out hearing to determine the admissibility of the text messages contained on the G-1 and Shadow telephones.

Detective Norris Tarkington testified that he worked in the homicide cold case unit for the Metropolitan Nashville Police Department and that he conducted a recorded interview with Mr. Marshall at Mr. Marshall's home. He testified that he was also present on March 2 when Mr. Marshall met with Ms. Frame in the hospital parking lot and at the time of Ms. Frame's arrest. He testified that Ms. Frame was in possession of the G-1 telephone at the time of her arrest. He stated that he also recovered from Ms. Frame's vehicle a camera with a photo of Defendant Dunkley on it, as well as a key chain with a photo of Ms. Frame and Defendant Dunkley.

Detective Tarkington testified that he conducted a recorded interview with Ms. Frame at the police station. He testified that initially she did not provide truthful information about the murder-for-hire scheme or her involvement. Detective Tarkington stated that, while in jail, Ms. Frame placed or received several telephone calls that were recorded. He testified that he monitored the telephone calls and that Ms. Frame mentioned Defendant Dunkley's and Defendant Miller's names throughout those calls. He stated that she mentioned Defendant Miller as being part of the scheme, and she stated that he had received $700 to take part in the scheme. Detective Tarkington listened to Ms. Frame ask the person on the other end of the call to "three-way call" Defendant Miller, and, once Defendant Miller was on the line, Ms. Frame asked him to return the money he had been paid. It was also during that call that Detective Tarkington learned of the existence of the Shadow telephone owned by Ms. Frame. After securing the Shadow phone from Ms. Frame's mother, Detective Tarkington stated that he turned the Shadow and G-1 telephones over to Detective Weaver for the extraction of reports from the telephones.

Detective Tarkington testified that he and another detective interviewed Ms. Dunkley at her residence, the same apartment to which he had seen Ms. Frame escort Mr. Marshall.

Detective Tarkington testified that he reviewed the report from Ms. Frame's G-1 telephone of the text messages, beginning on January 17, 2009, exchanged between Ms. Frame and Defendant Dunkley. He testified as to the content of these text messages, which included directions to Ms. Dunkley's apartment and references to killing Ms. Dunkley at her apartment, and their plan to break down Ms. Dunkley's apartment door with a sledgehammer, Ms. Dunkley's work schedule, and her children's school schedule. He testified that the text messages also discussed Ms. Frame's meeting with Mr. Marshall in the hospital parking lot.

Lieutenant Patrick Taylor testified that he worked for the Metropolitan Nashville Police Department, and he was part of the group of detectives monitoring the meeting between Ms. Frame and Mr. Marshall in the hospital parking lot on March 2, 2009. He testified that he observed the interaction between Ms. Frame and Mr. Marshall, and he witnessed Ms. Frame's green SUV pull into the parking lot, as well as a black Hummer. Lieutenant Taylor testified that he later learned that Defendant Dunkley owned a Hummer.

Stephanie Frame testified that she was charged for the same crimes as Defendant Miller and Defendant Dunkley and that the charges against her were still pending at the time of trial. Ms. Frame testified that she met Defendant Dunkley in 2005 and that Ms. Dunkley's uncle is married to Ms. Frame's mother. Ms. Frame testified that she and Defendant Dunkley entered into a sexual relationship in 2006, while he was still married to Ms. Dunkley. Ms. Frame testified that before her incarceration, she was a customer service representative at T-Mobile and a hair-stylist. Ms. Frame stated that Defendant Miller was her second cousin,

and she identified him and Defendant Dunkley in the courtroom. She also stated that she knew Mr. Chestnut from her work at T-Mobile.

Ms. Frame testified that, in January 2009, she purchased a G-1 Mobile phone and that, before that purchase, she owned a T-Mobile "Shadow" phone. She testified that, on the SIM card used in both of the phones, she had contact information for Defendant Dunkley and Defendant Miller, listed as "Brian, my love" and "Cousin William" respectively. She testified that the two men knew each other and that they were together during Thanksgiving and Christmas of 2007 at Ms. Frame's residence and her grandparents' residence. She stated that, after the 2007 holidays, Defendant Dunkley began making comments that Ms. Dunkley "was on borrowed time." Ms. Frame testified that, in January 2008, she took Defendant Dunkley to Defendant Miller's mother's house, where the two men met outside, while Ms. Frame went inside the house. She stated that, after his discussion with Defendant Miller, Defendant Dunkley told her that Defendant Miller "was going to be the one to take [Ms. Dunkley] out[]" and that he had given to Defendant Miller a picture of Ms. Dunkley, with her work address, home address, and information about two vehicles that Ms. Dunkley drove. Ms. Frame stated that, in early 2008, Defendant Dunkley showed Ms. Frame that same photograph of Ms. Dunkley and the information attached to it.

Ms. Frame testified that, later in January 2008, Defendant Dunkley said to her, "To show you how serious I am [about killing Ms. Dunkley], I gave [Defendant Miller] one of my guns." Ms. Frame recalled that Defendant Dunkley then showed her an empty weapon holster in his bedside drawer. Ms. Frame said she was "aware" of the communication between the two men at this time but that she was getting information about their communication from Defendant Dunkley. Defendant Dunkley told Ms. Frame that Defendant Miller was "watching" Ms. Dunkley to get information about "what's going on in her life."

Ms. Frame testified that Ms. Dunkley "moved back in with [Defendant Dunkley] in late March, beginning of April of 2008 so actually [Defendant Miller] had come to a halt." Ms. Frame stated that in the summer of 2008, Defendant Dunkley told her that he had asked Defendant Miller why he had stopped watching Ms. Dunkley. According to Defendant Dunkley, Defendant Miller responded that he had stopped because Ms. Dunkley had moved back in with Defendant Dunkley, and Defendant Dunkley responded, "you don't stop until I tell you to stop."

Ms. Frame testified that she invited Defendant Miller over for dinner in August 2008. She told Defendant Miller that she knew what he and Defendant Dunkley "were up to[,]" and Defendant Miller responded that he was "skeptical of doing the job" because he was not sure Defendant Dunkley would pay him. Ms. Frame assured him that Defendant Dunkley was

"trustworthy" but that Defendant Miller would not get paid until "it was done and . . . the insurance [was] cashed out. . . ." Defendant Miller wanted to know how long payment would take, and Ms. Frame asked Defendant Dunkley, who told her it would take no longer than thirty days.

Ms. Frame testified that she had a conversation with Defendant Miller about the gun Defendant Dunkley had given him. She stated that this was "during the times we [were] actually outside [Ms. Dunkley's] work building watching [her]." Defendant Miller told her that the gun given to him by Defendant Dunkley had been "apprehended by the police officers during an arrest in March 2008." Ms. Frame stated that, at some point in August 2008, she gave Defendant Miller her daughter's cellular telephone because "his cellular service was disconnected." Ms. Frame testified that during that time, she was using a T-Mobile "Shadow" telephone, which contained the SIM card she eventually transferred to the G-1 telephone.

Ms. Frame was asked to explain text messages contained in the report admitted into evidence that were sent between she and Defendant Dunkley. The jury was furnished with a copy of the report while Ms. Frame testified about their content. She testified that on August 20, 2008, she and Defendant Dunkley exchanged text messages in regards to giving Defendant Miller directions to Ms. Dunkley's home and work. She stated that on August 22, 2008, she received text messages from Defendant Dunkley "giving [Ms. Dunkley's] schedule[,]" including when the doors to her work building would be locked, where she parked her car, where security cameras were located, and what time Ms. Dunkley went in to work. Defendant Dunkley also sent text messages describing the interior of Ms. Dunkley's work building.

Referencing the report, Ms. Frame stated that on September 19, 2008, Defendant Dunkley sent her multiple text messages explaining Ms. Dunkley's schedule and where she parked her car at work. She stated that Defendant Dunkley sent a text message from inside Ms. Dunkley's work building, where he was getting his hair done, indicating that he would give information about where Ms. Dunkley's car was parked and how full the parking lot was. Ms. Frame testified that she and Defendant Miller "were walking throughout the area" where Ms. Dunkley worked and that they spotted a security camera on a building. Ms. Frame sent a text message with this information to Defendant Dunkley. Ms. Frame explained that she and the two men were "interested" in where Ms. Dunkley parked her car "[s]o that it would be an easy and simple drive for [Defendant Miller to kill Ms. Dunkley] without being noticed."

Ms. Frame testified that on September 20, 2008, Defendant Dunkley sent her a text message that said, "It needs to happen. Don't know how much longer I can deal." Ms.

Frame explained that "it" meant Defendant Miller killing Ms. Dunkley. Ms. Frame testified that Defendant Dunkley sent more text messages detailing Ms. Dunkley's whereabouts on September 21, and gave more information about Ms. Dunkley's work building and which doors were unlocked. Defendant Dunkley sent Ms. Frame another text message on September 21 saying, "This bitch is crazy. [Defendant Miller killing Ms. Dunkley] needs to happen ASAP. Is [Defendant Miller] for real." Ms. Frame testified that she had the keys to Ms. Dunkley's car and that she asked Defendant Dunkley if Defendant Miller could "wait inside [Ms. Dunkley's] car and get her that way[,]" to which Defendant Dunkley replied, "I don't think [Defendant Miller will] be able to wait in the ride. Maybe out on the side." On September 24, 2008, Defendant Dunkley sent more text messages updating the "status" of Ms. Dunkley's work schedule, and saying, "Follow her. She told me she was working."

Ms. Frame testified in more detail about the planning that occurred between she, Defendant Dunkley, and Defendant Miller to kill Ms. Dunkley:

> [Ms. Dunkley] never leaves the building by herself, she always walks out with either a person or a group of people, [Defendant Miller] stated that [her workplace] is not a good spot. So [Defendant Miller] wanted to get her as she was going home, but that's when [Defendant Dunkley] replied, you can't do it at my home because we live across the street from the police.

On September 24, Defendant Dunkley sent a text message to Ms. Frame saying "[Ms. Dunkley is] acting funny but she didn't say anything. I know if [the killing] don't happen real soon it will all be bad." He later sent a message saying, "Got me ready to do something, just don't know how without it coming back[,]" which Ms. Frame explained meant that Defendant Dunkley was going to kill Ms. Dunkley himself. He later sent text messages saying, "I damn near choked the shit out of her" and "Help me . . . get rid of the bitch[,]" referring to Ms. Dunkley. Ms. Frame stated that he sent her text messages about fights between he and Ms. Dunkley. On September 27, Defendant Dunkley sent Ms. Frame a text message referring to killing Ms. Dunkley without it being linked to him saying, "Yes, if I thought I could I would. Have [been] up thinking about what and how." Ms. Frame testified that the sexual relationship between she and Defendant Dunkley was still going on throughout this time period.

Ms. Frame testified that the arrangement with Defendant Miller included payment of $50,000 if he killed Ms. Dunkley. Ms. Frame explained that Defendant Dunkley planned to use some of the proceeds from the life insurance policy he held on Ms. Dunkley. Ms. Frame stated that, after the police seized the gun from Defendant Miller in March 2008, he procured another handgun in August or September of 2008, which was during the time he was watching Ms. Dunkley. Ms. Frame said that, in 2009, she purchased a third gun from her

uncle and gave it to Defendant Miller. She stated that Defendant Miller was concerned that he was not getting paid any money up front.

Ms. Frame testified that she was still in a sexual relationship with Defendant Dunkley in January 2009. Ms. Frame stated that, when Ms. Dunkley moved to a new apartment, Defendant Dunkley sent Ms. Frame a text message asking for Ms. Dunkley's new address. Ms. Frame testified that Defendant Miller continued to complain about not receiving any money "up front," so she planned to give him $500. Ms. Frame testified that, in January 2009, she called Defendant Miller and told him that she knew where Ms. Dunkley lived and "to motivate him" she would give him the $500 in advance to "do the job[.]" She then sent text messages to Defendant Dunkley asking if he was willing to work with Defendant Miller again to have Ms. Dunkley killed. Ms. Frame stated that she showed Defendant Miller the apartment complex where Ms. Dunkley lived, as well as a layout of her apartment that she picked up at the apartment complex's leasing office. Ms. Frame also took a tour of an apartment in Ms. Dunkley's building and shared the information she gained from the tour with Defendant Miller.

Ms. Frame testified that it was part of the "plan" for Defendant Dunkley to contribute money to pay Defendant Miller "upfront." Defendant Dunkley stated that he would contribute $500 to Defendant Miller or let him "hold the title to [Defendant Dunkley's] Hummer[.]"

Ms. Frame testified that, once Defendant Miller "started back up" with his involvement in the plan to kill Ms. Dunkley, Ms. Frame added minutes to a prepaid phone so that he and Defendant Dunkley could communicate. Ms. Frame explained that Defendant Dunkley referring to Ms. Dunkley being on "[b]orrowed time" was a reference to the plan to kill her. Ms. Frame testified that she and Defendant Dunkley communicated about when Ms. Dunkley's children would not be with her so that Defendant Miller could kill Ms. Dunkley without the children being present. She stated that the "plan" was for Defendant Miller "to go into [Ms. Dunkley's] apartment, and we really didn't want the kids to be there."

Ms. Frame testified that, in the "early morning hours" of February 8, 2009, she and Defendant Miller went to Ms. Dunkley's apartment for the purpose of breaking into Ms. Dunkley's home "for [Defendant Miller] to kill her." Ms. Frame stated that Defendant Miller brought a sledgehammer and a gun with him. Ms. Frame drove them to the apartment in her truck. She described what occurred when they arrived, stating:

> That early morning, [Defendant Miller] and I went to [Ms. Dunkley's] home and we were on her front porch. And the plan was [Defendant Miller] would hit the door once with the hammer. And if it opened, I would take the

sledgehammer and go back into . . . the truck and wait while [Defendant Miller] goes in and kills [Ms. Dunkley].

If the door didn't open, we would go back to the truck and leave without being noticed.

The door didn't open so we left. And [Defendant Miller] said the only other option was for him to get [Ms. Dunkley] as she was going into the apartment.

Ms. Frame stated she and Defendant Miller were concerned that Ms. Dunkley's boyfriend had a gun, and Defendant Miller was nervous about the boyfriend, so Ms. Frame asked Defendant Dunkley about the boyfriend's personality. Ms. Frame testified that she and Defendant Miller "decided that we were going to go with 'Plan B,' which was to get [Ms. Dunkley] as she was going into the apartment." She testified that she informed Defendant Dunkley of the plan, which was to follow Ms. Dunkley and her boyfriend into "their [apartment] tomorrow so there won't be any mistakes."

Ms. Frame confirmed that she received text messages from Defendant Dunkley on February 8, 2009, asking her if Defendant Miller had used the sledgehammer on the right door, and she informed Defendant Dunkley that he had and that she and Defendant Miller had decided to go with the new plan, "Plan B." Ms. Frame stated that she went back to the apartment later on February 8, to check on the condition of Ms. Dunkley's apartment door, and reported what she saw to Defendant Dunkley.

Ms. Frame testified that, on February 9, 2009, she and Defendant Dunkley discussed via text message that having his daughter with him at the time of the murder would be a "good alibi" for him. Ms. Frame testified that on February 10, she and Defendant Miller followed Ms. Dunkley while she took her oldest daughter to school and her younger daughter to Ms. Dunkley's mother's house. Ms. Frame stated that, in a rental car, she and Defendant Miller continued to follow Ms. Dunkley throughout the day. After following Ms. Dunkley, Ms. Frame sent text messages to Defendant Dunkley with "all of that information" about where they had followed Ms. Dunkley. Ms. Frame explained that she rented a vehicle because she thought Ms. Dunkley might know what her vehicle looked like. Ms. Frame stated that she communicated this as well to Defendant Dunkley. The receipt from the car rental was admitted into evidence.

Ms. Frame testified that Defendant Dunkley sent a present to her at work on February 14, 2009. She stated that they exchanged text messages on February 17, and Defendant Dunkley, referring to his divorce proceedings with Ms. Dunkley, stated that he was "going

to lose everything" to Ms. Dunkley. Ms. Frame sent a text message back saying she had told Defendant Miller that "it [had] to happen before Friday." Ms. Frame testified that Defendant Dunkley called Defendant Miller and "let him know how serious" the situation was, because Defendant Dunkley "was in fear of losing everything that he had."

Ms. Frame testified that Defendant Miller was sick and that she and Defendant Dunkley were waiting for him to get better before he killed Ms. Dunkley. Ms. Frame said she asked Defendant Miller if she could retrieve the gun and do the killing herself, but Defendant Miller said no because he was going to "do it the right way like [Defendant Dunkley] said." Ms. Frame testified that Defendant Dunkley asked her if she could get him a "throwaway like ASAP[,]" meaning a gun that was not registered in his name. She also testified that they discussed Ms. Frame killing Ms. Dunkley before trying again to find someone else to do it. She explained that it was at this point that Mr. Chestnut became involved. She said that Mr. Chestnut was one of her clients and "seemed as if he would be able to locate someone to do the killing."

Ms. Frame testified that she asked Mr. Chestnut to call her. When Mr. Chestnut called, she asked him "if he knew someone that would want to make $10,000[.]" Mr. Chestnut told her he might know someone, and Ms. Frame told Defendant Dunkley she may have found someone who would kill Ms. Dunkley for less money than Defendant Miller. Defendant Dunkley warned Ms. Frame to be careful about to whom she spoke of their plan. Ms. Frame stated that while they waited to hear from Mr. Chestnut, she and Defendant Dunkley tried to come up with another person who would kill Ms. Dunkley. She stated that the killing needed to be done by a certain day because, "according to [Defendant Dunkley], if [Ms. Dunkley] found out that [Defendant Dunkley] had cosigned for [Ms. Frame's] Mountaineer and that . . . the Hummer was in [Ms. Frame's] name all hell would break loose and he would lose everything."

Ms. Frame testified that, when she got the weapon back from Defendant Miller, it was "dirty" with fingerprints, so Defendant Dunkley came to her residence to clean it. On March 2, 2009, Ms. Frame sent a message to Defendant Dunkley with a scenario for killing Ms. Dunkley as she was leaving her work. Defendant Dunkley responded that it could be "Any night. Hell. Even tonight." Ms. Frame testified that she then received two telephone calls from Mr. Marshall, who had been contacted by Mr. Chestnut, and they arranged to meet at the hospital.

Ms. Frame testified that on March 2, 2009, she met with Mr. Marshall in a hospital parking lot with the intent to hire him to kill Ms. Dunkley. Ms. Frame agreed that she brought "all the equipment that [she] thought might be necessary to accomplish" killing Ms. Dunkley, including a revolver, gloves, and mace. She stated she had never met Mr. Marshall

before that day. Ms. Frame agreed that she drove Mr. Marshall to Ms. Dunkley's apartment, and agreed that she "offer[ed] to accompany [Mr. Marshall] in [to the apartment] to make sure that [Ms. Dunkley] was killed[.]" Ms. Frame agreed that she did not tell the truth to the police at the time of her arrest.

Ms. Frame testified that while she was incarcerated, she had a three-way telephone conversation with her mother, Maggie Alderson, and Defendant Miller. Ms. Frame recalled that she asked Defendant Miller to give $700 of the $1,000 he had already been paid to Ms. Alderson, to take care of Ms. Frame's children. Ms. Frame explained:

> On February the 2nd of 2009 [Defendant Dunkley] and I had given [Defendant Miller] $1,000. Within three or four days after I went back and got $300 from [Defendant Miller] so that I could purchase a gun for him, so that's where the $700 comes from.
>
> [Defendant Miller] was given $1,000 and we took $300 back.

Ms. Frame testified that the plan was for her to communicate in code with Defendant Dunkley, to say "reddish brown" to indicate "if [Ms. Dunkley] was killed at night that would be the code used and that's to let [Defendant] Dunkley know that it was taken care of."

On cross-examination, Ms. Frame testified that she was "positive" that she had not been offered a deal as compensation for her testimony. Ms. Frame agreed that she had not witnessed Defendant Dunkley give the picture of Ms. Dunkley and her information to Defendant Miller in January 2008. She testified that she saw the picture and information inside Defendant Dunkley's residence. She agreed that she never saw the gun Defendant Dunkley gave Defendant Miller for the purpose of killing Ms. Dunkley but was later taken by the police.

Ms. Frame recalled that she and Defendant Miller did "surveillance" on Ms. Dunkley in August and September of 2008, and they followed her on one other occasion. She agreed that she purchased the "third gun in this incident" from her uncle for $300 in February 2009. Ms. Frame stated it was a .38 revolver, and she had six bullets for it. She stated that she gave it to Defendant Miller. She next saw the gun on February 8, 2009, during the sledgehammer incident, when "Defendant Miller put it on his person [in the waistband of his pants] so we could go on the porch of [Ms. Dunkley's] home." She saw the gun again on February 10, 2009, when she and Defendant Miller followed Ms. Dunkley in her vehicle. Ms. Frame stated that she picked the gun up from Defendant Miller on February 27, and had it with her when she was arrested.

Ms. Frame stated that, when she was arrested, she originally lied about Defendant Dunkley and Defendant Miller's involvement. She testified that, on average, she exchanged fifty to seventy-five text messages per day with Defendant Dunkley. Ms. Frame agreed that her "interpretation" of Defendant Dunkley's text messages was being relied on to link him to the scheme to kill Ms. Dunkley. Ms. Frame stated that Ms. Dunkley was aware of the sexual relationship between Defendant Dunkley and Ms. Frame.

Ms. Frame testified that, on January 26, 2009, she sent a text message to Defendant Dunkley telling him that she was going to give Defendant Miller the $500 and show him where Ms. Dunkley lived. Ms. Frame described Defendant Dunkley as "paranoid," but said that he used the cellular telephone registered in his name and deleted the text messages on it. Ms. Frame stated that she did not delete any text messages on her telephone because she did not think she would get caught. Ms. Frame stated that she wanted to kill Ms. Dunkley because Defendant Dunkley "said that that was the only way we could be happy and together."

On re-direct examination, Ms. Frame said she made it "very clear" to Mr. Chestnut that she wanted to pay someone to do a killing. Ms. Frame stated that she became involved in the divorce proceedings between Defendant Dunkley and Ms. Dunkley and that Defendant Dunkley's Hummer was an issue in the divorce. She testified that the materials from the Dunkleys' divorce proceedings were mailed to her, because Defendant Dunkley "claim[ed] he had sold the Hummer to [Ms. Frame.]"

Ms. Frame testified that, on the day of her arrest, Defendant Dunkley had telephone conversations with her mother and stepfather. She further testified that the telephone records from her Shadow contained text messages between she and Defendant Dunkley of a sexual nature with explicit sexual detail in them.

Kristi Dunkley testified that she was married to Defendant Dunkley, but they had since divorced and she had reacquired her maiden name, Alderson. Ms. Dunkley confirmed that her uncle, Tim Alderson, was Ms. Frame's stepfather. She testified that she and Defendant Dunkley were married in 1995 and that during their marriage had several periods of separation. She stated that, in April 2008, they moved back in together but separated in September 2008. She stated that their separation was "ugly," and she left their marital home, taking her two children with her, one of which was also Defendant Dunkley's daughter. Ms. Dunkley stated that she became aware that Defendant Dunkley was having an affair with Ms. Frame and that the reason for their divorce was "numerous affairs and children born out of affairs." Ms. Dunkley stated that Defendant Dunkley had a son with another woman, unrelated to this case, that he told her about in April 2008. Ms. Dunkley stated that the other woman dropped Ms. Dunkley's children off at Ms. Dunkley's home in December 2008 in

"the Hummer."

Ms. Dunkley testified that she owned her own hair salon on 21st Avenue North and that she lived with her mother in East Nashville when she and Defendant Dunkley separated in 2008. She testified that she got an apartment in January 2009 in Goodlettesville. Ms. Dunkley testified that on January 22, 2009, she took out an order of protection against Defendant Dunkley, and a court proceeding followed on February 2 to establish child support and visitation.

Ms. Dunkley stated that, on February 7, 2009, she returned home to her apartment at approximately 11:00 p.m. with her boyfriend, Kevin Sherrell. When Ms. Dunkley tried to leave her apartment the next day, she could not open her front door and noticed that the frame around the door was cracked and split. She stated that she called the Goodlettesville Police Department and made a report.

Ms. Dunkley testified that, on March 2, 2009, Mr. Marshall knocked on her apartment door at around 8:00 or 9:00 p.m. Ms. Dunkley said that she was alarmed because no one knew where she lived other than her mother and best friend. Mr. Marshall asked to speak to Kristi Dunkley, and then told her that, "someone named Stephanie hired him to kill somebody named Kristi Dunkley." Ms. Dunkley said she immediately left her apartment to go to her mother's house, and she called the police on the way.

Ms. Dunkley agreed that, when she was living in the "marital home" with Defendant Dunkley, a police officer lived across the street. Ms. Dunkley stated that, during their divorce proceedings, she and Defendant Dunkley owned a Hummer, a Chevy Silverado, "some old-school car," a motorcycle, and a Chevy Malibu. Ms. Dunkley stated that because she could not make payments on the Malibu, it was repossessed, and she asked the divorce court to give her one of the other vehicles. She stated that Defendant Dunkley claimed to the divorce court that he had sold the Hummer to Ms. Frame, and the court ultimately ordered him to give the money he received from the sale of the Hummer to Ms. Dunkley, in the amount of $10,000.

Ms. Dunkley testified that, prior to her moving out of the marital home, Defendant Dunkley was in possession of several guns, including one that he kept in a holster.

On cross-examination, Ms. Dunkley stated that Defendant Dunkley was physically abusive toward her while they were married. Defendant Dunkley told her, when they got back together in April 2008, that he had been in a relationship with Ms. Frame.

Kevin Sherrell testified that he was a "personal friend" of Defendant Dunkley's since

-15-

2000, and that he was also friends with Ms. Dunkley. He stated that he knew of Ms. Frame through the Dunkleys and that they had been at parties together but he had never talked with her directly. He testified that Ms. Frame and Defendant Dunkley were "dating" "for certain" and that he would see them together "most of the time."

On cross-examination, Mr. Sherrell testified that Defendant Dunkley was married to Ms. Dunkley during the time he and Ms. Frame were together and having a sexual relationship. He agreed that Defendant Dunkley owned a black Hummer that became an issue during the Dunkleys' divorce proceedings.

Following this evidence, the jury convicted Defendant Dunkley of one count of conspiracy to commit first degree murder. The jury convicted Defendant Miller of one count of conspiracy to commit first degree murder, one count of attempted aggravated burglary, and one count of attempted first degree premeditated murder. The trial court sentenced both defendants to serve twenty-five year sentences in the Tennessee Department of Correction. It is from these judgments that the defendants appeal.

## II. Analysis

On appeal, Defendant Dunkley asserts that: (1) the trial court erred when it admitted text messages into evidence pursuant to Tennessee Rule of Evidence 404(b); (2) the trial erred when it denied his motion for new trial because the trial court failed to function as the thirteenth juror and because newly discovered evidence warranted a new trial; (3) there is insufficient evidence to support his conviction; and (4) the trial court improperly applied enhancement factors when it sentenced him. Defendant Miller asserts that: (1) there is insufficient evidence to support his convictions; (2) the trial court erred when it denied his motion for new trial because the trial court failed to function as the thirteenth juror; and (3) the trial court erred when it imposed consecutive sentences.

### A. Defendant Dunkley
### 1. Admission of 404(b) Evidence

Defendant Dunkley contends that the trial court erred when it admitted text messages into evidence pursuant to Tennessee Rule of Evidence 404(b). He argues that the text messages were "outside the scope of the conspiracy," because the text messages were exchanged during the time period of August 2008 through January 2009, which was before the dates of the conspiracy as alleged in the indictment, January 2009 through March 2009. He contends that the State failed to prove by clear and convincing evidence that a material issue existed other than conduct conforming with the negative character traits displayed by the text messages. The Defendant further states that the State failed to prove that the

probative value of the text messages outweighed the undue prejudice. The State responds that the text messages were admissible under the enumerated purposes of Rule 404(b), because the messages showed Defendant Dunkley's motive and intent to commit the offense and also provided a contextual background for the conspiracy, namely that he was in a sexual relationship with Ms. Frame while married to Ms. Dunkley. We agree with the State.

The Tennessee Rules of Evidence provide that all "relevant evidence is admissible," unless excluded by other evidentiary rules or applicable authority. Tenn. R. Evid. 402. Of course, "[e]vidence which is not relevant is not admissible." Tenn. R. Evid. 402. Relevant evidence is defined as evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Even relevant evidence, however, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

Evidence of other crimes, wrongs, or bad acts is not admissible to prove the character of a person to show action in conformity with that character. *Id*. at 404(b). Such evidence may be admissible, however, for "other purposes." *Id*. Our Supreme Court has determined that such "other purposes" include demonstrating motive or intent. *State v. Berry*, 141 S.W.3d 549, 582 (Tenn. 2004). Such evidence is admissible for other purposes, provided that the trial court: (1) upon request, holds a hearing outside the jury's presence; (2) determines that a material issue exists other than conduct conforming with a character trait and, upon request, states the basis for its determination; (3) finds proof of the other crime, wrong, or act to be clear and convincing; and (4) determines that the probative value of the evidence is not outweighed by the danger of unfair prejudice. Tenn. R. Evid. 404(b). The safeguards in Rule 404(b) ensure that defendants are not convicted for charged offenses based on evidence of prior crimes, wrongs, or acts. *State v. James*, 81 S.W.3d 751, 758 (Tenn. 2002). When a trial court substantially complies with the procedural requirements of Rule 404(b), the standard of appellate review of the trial court's decision is abuse of discretion. *See State v. Powers*, 101 S.W.3d 383, 395 (Tenn. 2003); *James*, 81 S.W.3d at 759. If the strict requirements of the rule are not substantially observed, the reviewing court gives the trial court's decision no deference. *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997).

The trial court held a hearing on the Rule 404(b) evidence outside the presence of the jury. Ms. Frame testified about when her relationship with Defendant Dunkley began, the planning between he and Defendant Miller to kill Ms. Dunkley, the communication between the defendants as told to her by Defendant Dunkley, via text message, as well as Defendant Miller "lying in wait" for Ms. Dunkley, which Ms. Frame relayed to Defendant Dunkley, also

by text message.  After hearing the evidence, the trial court reviewed the admissibility factors enumerated in 404(b).  It found that the entirety of the text messages, including those exchanged before the dates listed on the indictment, was relevant to show intent in the conspiracy.  The trial court found that the State had proven by clear and convincing evidence that the messages corroborated the relationship and connection between Defendant Dunkley, Ms. Frame, and Ms. Dunkley, and the defendants' alleged intent to kill Ms. Dunkley.  The court further found that material issues other than conduct conforming with a character trait existed, namely identity and participation.  The court found that the substance of the text messages were sexual in nature and contained sexual photographs exchanged between Ms. Frame and Defendant Dunkley, proving the relationship between them, and the text messages also discussed Defendant Miller, before the alleged conspiracy at issue in the trial.  The court found that text messages relaying to Defendant Dunkley specific accounts of Ms. Frame and Defendant Miller following and conducting surveillance on Ms. Dunkley, and messages containing Defendant Dunkley's instructions to Ms. Frame and Defendant Miller as to when and where Ms. Dunkley was working or living, what car she was driving, and when she was with her children, proved the participation of all three parties in the conspiracy.

The trial court found that the text messages were highly probative during the 2008 time frame to show "the meetings and the discussion and [] what was being said with [Defendant] Dunkley and Ms. Frame" and that the messages connected the defendants and Ms. Frame to the alleged conspiracy.  The trial court also noted that, without the text messages as an "explanation," there would have been a "void" about when the defendants and Ms. Frame first started discussing killing Ms. Dunkley, as well as who "him" was when the parties referred to Defendant Miller and any money they had already paid him.

We conclude that text messages between Ms. Frame and Defendant Dunkley provided a background of their romantic relationship, which was indicative of motive to kill Defendant Dunkley's wife.  In the months leading up to the date alleged on the indictment, text messages were exchanged about Defendant Dunkley wanting to choke and kill Ms. Dunkley.  The charge of conspiracy required the State to prove that Defendant Dunkley had the culpable mental state to commit the offense and that he entered into an agreement, however informal, with Ms. Frame and/or Defendant Miller.  The text messages about Defendant Dunkley wanting to kill his wife, their marital troubles, and his efforts to procure money to pay for the weapon or to pay another person to do the killing is evidence that Defendant Dunkley had the intent to carry out the murder.  Thus, we agree with the trial court's determination that this evidence was admissible under the purposes of Rule 404(b).

Accordingly, the trial court properly exercised its discretion in admitting evidence of the 2008 text messages to show the intent of Defendant Dunkley.  Further, the trial court properly instructed the jury on the manner in which it should consider the text messages, and

this Court must presume that a jury followed the trial court's instructions. *See State v. Odom*, 336 S.W.3d 541, 562 (Tenn. 2011). The Defendant is not entitled to relief.

## 2. Thirteenth Juror

Defendant Dunkley contends that the trial court erred when it denied his motion for new trial on the grounds that the trial court did not act as the thirteenth juror because it "did not state that [it] agreed that the evidence supported the verdict - which would show that the trial court conducted its own independent evaluation of the case." Defendant Dunkley contends that the trial court "improperly executed" its responsibility as thirteenth juror by "simply rel[ying] on the jury's verdict without any independent reflection of the evidence submitted at trial." The State responds that "nothing" in the record indicates that the trial court was dissatisfied with the jury's verdict or that the trial court disagreed with the verdict. The State further contends that the trial court's statement that "[the] jury verdicts will become the judgment of the Court" clearly indicates the trial court's approval of the verdict in its role as the thirteenth juror. We agree with the State.

Tennessee Rule 33 of Criminal Procedure states that a "trial court may grant a new trial following a verdict of guilty if it disagrees with the jury about the weight of the evidence." Tenn. R. Crim. P. 33(d). This rule "'is the modern equivalent to the thirteenth juror rule, whereby the trial court must weigh the evidence and grant a new trial if the evidence preponderates against the weight of the verdict.'" *State v. Biggs*, 218 S.W.3d 643, 653 (Tenn. Crim. App. 2006) (quoting *State v. Blanton*, 926 S.W.2d 953, 958 (Tenn. Crim. App. 1996)). The initial sub-section of Rule 33 states, "On its own initiative or on a motion of a defendant, the court may grant a new trial as required by law." Tenn. R. Crim. P. 33(a). Moreover, after considering the legislature's intent and the prior thirteenth juror rule, the Tennessee Supreme Court interpreted Rule 33 as "impos[ing] upon a trial court judge the mandatory duty to serve as the thirteenth juror in every criminal case." *State v. Carter*, 896 S.W.2d 119, 122 (Tenn. 1995). It also concluded that "approval by the trial judge of the jury's verdict as the thirteenth juror is a necessary prerequisite to imposition of a valid judgment." *Id.*

We point out that Rule 33(d) does not require the trial judge to make an explicit statement of approval on the record. Instead, when the trial judge simply overrules a motion for new trial, an appellate court may presume that the trial judge has served as the thirteenth juror and approved the jury's verdict. *Id.* Only if the record contains statements by the trial judge indicating disagreement with the jury's verdict or evidencing the trial judge's refusal to act as the thirteenth juror, may an appellate court reverse the trial court's judgment. *Id.* Otherwise, appellate review is limited to sufficiency of the evidence pursuant to Rule 13(e) of the Rules of Appellate Procedure. *State v. Burlison*, 868 S.W.2d 713, 718-19 (Tenn.

Crim. App. 1993). If the reviewing court concludes that the trial judge has failed to fulfill his or her role as thirteenth juror, the reviewing court must grant a new trial. *State v. Moats*, 906 S.W.2d 431, 435 (Tenn.1995).

The trial court, after reading the jury's verdict to the defendants, stated that the verdict would "become the judgment of the Court." The record does not contain any statement made by the trial court to indicate its disagreement with the verdict nor does it contains a statement of the trial court's refusal to act as the thirteenth juror. Thus, we presume that the trial court properly served as the thirteenth juror and we will not reverse its judgment. Defendant Dunkley is not entitled to relief.

### 3. Newly Discovered Evidence

Defendant Dunkley also contends that the trial court erred in denying his motion for a new trial based on newly discovered evidence in the form of Ms. Frame's testimony at her own September 7, 2011 parole hearing, which Defendant Dunkley contends was "substantially different" than her testimony at his trial. The State responds that the trial court properly found that Ms. Frame's testimony at the parole hearing did not "significantly differ" from her testimony at trial. We agree with the State.

To be entitled to a new trial on the basis of newly discovered evidence, a defendant must show: (1) that he or she used reasonable diligence in seeking the newly discovered evidence; (2) that the new evidence is material; and (3) that the new evidence will likely change the result of the trial. *See State v. Nichols*, 877 S.W.2d 722, 737 (Tenn. 1994). Whether to grant a new trial on the basis of newly discovered evidence lies within the sound discretion of the trial court. *See State v. Caldwell*, 977 S.W.2d 110, 117 (Tenn. Crim. App. 1997). Accordingly, we review this issue for an abuse of discretion. *See State v. Meade*, 942 S.W.2d 561, 565 (Tenn. Crim. App. 1996).

Defendant Dunkley argues that Ms. Frame's testimony in the parole hearing that "effectively minimized her involvement in the conspiracy, and that she had no active part in it until after [Defendant Miller] lost his transportation" is contrary to her trial testimony that portrayed her as a central figure in the conspiracy discussions that she alleged occurred between Defendant Dunkley and Defendant Miller. At the motion for new trial, the trial court held that this was "not new evidence" and found that her testimony at the hearing was merely a summary of her six hour trial testimony.

After a review of the record, we conclude that the trial court did not abuse its discretion when it refused to grant Defendant Dunkley a new trial on this basis. In our view, Ms. Frame's testimony at the parole hearing is not newly discovered evidence. Furthermore,

Defendant Dunkley did not provide a basis for establishing that the allegedly contradictory testimony was material or that it would change the outcome of his trial. Defendant Dunkley is not entitled to relief on this issue.

## 4. Sufficiency of the Evidence

Defendant Dunkley next contends that the proof is insufficient to support his conviction for conspiracy to commit first degree murder because "no nexus between Defendant Dunkley and the text messages attributed to him was created" and any additional proof is insufficient to "tie him to a conspiracy to kill [Ms.] Dunkley." The State responds that the evidence was sufficient to prove that Defendant Dunkley planned Ms. Dunkley's murder and provided direction and money to ensure that she would be killed. The State further contends that the evidence that was presented through Ms. Frame's testimony is sufficiently corroborated by the text messages exchanged between she and Defendant Dunkley. We agree with the State.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the

weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "'A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State.'" *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978) (quoting *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973)). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

It is well-settled law in Tennessee that a criminal defendant cannot be convicted solely on the uncorroborated testimony of an accomplice. *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994), *superseded by statute on other grounds as stated in State v. Odom*, 137 S.W.3d 572, 580-81 (Tenn. 2004). The determination as to whether a witness is an accomplice or not may be a matter of law for the trial court's determination or it may be a question of fact for the jury's determination. *State v. Perkinson*, 867 S.W.2d 1, 7 (Tenn. Crim. App. 1992). When the facts are clear and undisputed concerning a witness's participation in the crime, whether he is an accomplice is a question of law for the court to decide. When the facts are in dispute or susceptible to different inferences, it becomes a question of fact for the jury. *Conner v. State*, 531 S.W.2d 119, 123 (Tenn. Crim. App. 1975).

"An accomplice is one who knowingly, voluntarily, and with common intent unites with the principal offender in the commission of a crime." *State v. Allen*, 976 S.W.2d 661, 666 (Tenn. Crim. App. 1997). To satisfy the definition of an accomplice, it is not enough that the witness merely possess guilty knowledge, is morally delinquent, or even participated

in a distinct but related offense. *See State v. Lawson*, 794 S.W.2d 363, 369 (Tenn. Crim. App. 1990). The general test is whether the accomplice could be indicted for the offense charged against the defendant. *Id.*

The law in Tennessee regarding the corroboration required for accomplice testimony has been described as follows:

> The rule simply stated, is that there must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence.

*State v. Shaw*, 37 S.W.3d 900, 903 (Tenn. 2001) (quoting *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994) (citations omitted)). Ultimately, it is a question for the jury to determine whether an accomplice's testimony has been sufficiently corroborated. *Pennington v. State*, 478 S.W.2d 892 (Tenn. Crim. App. 1971).

First degree murder is the premeditated and intentional killing of another person. T.C.A. § 39-13-202(a)(1). A premeditated killing is one "done after the exercise of reflection and judgment." T.C.A. § 39-13-202(d). The element of premeditation is a question of fact for the jury. *State v. Davidson*, 121 S.W.3d 600, 614 (Tenn. 2003). Although the jury may not engage in speculation, it may infer premeditation from the manner and circumstances surrounding the killing. *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997). In *State v. Nichols*, 24 S.W.3d 297, 302 (Tenn. 2000), our Supreme Court delineated the following circumstances from which a jury may infer premeditation:

> Declarations by the defendant of an intent to kill, evidence of procurement of a weapon, the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, infliction of multiple wounds, preparation before the killing for concealment of the crime, destruction or secretion of evidence of the murder, and calmness immediately after the killing.

The jury may also infer premeditation from the establishment of a motive for the killing and

the use of multiple weapons in succession. *State v. Leach*, 148 S.W.3d 42, 54 (Tenn. 2004).

The offense of conspiracy is committed if two or more people, each having the culpable mental state required for the offense which is the object of the conspiracy and each acting for the purpose of promoting or facilitating commission of an offense, agree that one or more of them will engage in conduct which constitutes such offense. T.C.A. § 39-12-103(a) (2010). It is also required that "an overt act in pursuance of such conspiracy is alleged and proved to have been done by the person or by another with whom the person conspired." T.C.A. § 39-12-103(d) (2010).

The essential feature of the crime of conspiracy is the accord - the agreement to accomplish a criminal or unlawful act. *See State v. Pike*, 978 S.W.2d 904, 915 (Tenn.1998); *State v. Hodgkinson*, 778 S.W.2d 54, 58 (Tenn. Crim. App.1989). A formal agreement is not required, nor must it be expressed; it may, and often will be, proven by circumstantial evidence. *See Pike*, 978 S.W.2d at 915; *State v. Shropshire*, 874 S.W.2d 634, 641 (Tenn. Crim. App.1993); *State v. Gaylor*, 862 S.W.2d 546, 553 (Tenn. Crim. App.1992) ("[A] mutual implied understanding is sufficient, although not manifested by any formal words, or a written agreement"). "The unlawful confederation may be established by circumstantial evidence and the conduct of the parties in the execution of the criminal enterprise. Conspiracy implies concert of design and not participation in every detail of execution." *Randolph v. State*, 570 S.W.2d 869, 871 (Tenn. Crim. App. 1978).

The evidence, in the light most favorable to the State, established that Defendant Dunkley and Ms. Frame were lovers for two and a half years and both desired the elimination of the victim, Ms. Dunkley. Defendant Dunkley and Ms. Frame discussed via text message various plans to murder Ms. Dunkley, and Defendant Dunkley provided Defendant Miller with a weapon. Defendant Dunkley provided information to Ms. Frame and Defendant Miller about Ms. Dunkley's work schedule, the premises in and around her work building, and what vehicles she drove. Transcripts of the text messages show that Defendant Dunkley made many references throughout to killing Ms. Dunkley, such as she was on "borrowed time" and was going to be "taken out." Defendant Dunkley sent text messages to Ms. Frame expressing his frustration with Ms. Dunkley and stating that he needed Ms. Dunkley to be killed before things got "bad." Defendant Dunkley planned to pay Defendant Miller with money he collected from the life insurance policies.

The evidence that corroborates Ms. Frame's testimony is Ms. Dunkley's testimony, the transcripts of the text messages, the insurance agent's testimony, and Mr. Sherrell's testimony. A cellular telephone records custodian testified that the text messages sent to Ms. Frame discussing killing Ms. Dunkley came from a telephone number registered to Defendant Dunkley. Ms. Dunkley testified that she and Defendant Dunkley were in the

process of divorcing in early 2009 and that she had requested the divorce court to award her one of Defendant Dunkley's vehicles after hers was repossessed. This testimony corroborates Ms. Frame's statement that Defendant Dunkley wanted Ms. Dunkley killed within a certain time frame, before their divorce situation "got bad." Ms. Dunkley also testified that she was aware of Defendant Dunkley's sexual relationship with Ms. Frame, and that she and Defendant Dunkley had had an "ugly" marital separation in 2008, corroborating Ms. Frame's testimony that Defendant Dunkley had a motive to kill his wife. Ms. Dunkley testified that Defendant Dunkley owned several weapons and a holster, corroborating Ms. Frame's testimony that Defendant Dunkley had given Defendant Miller a weapon to use in the murder. An agent from State Farm Insurance Agency testified that Defendant Dunkley owned two insurance policy on Ms. Dunkley's life totaling $300,000, corroborating Ms. Frame's testimony that the insurance money would be used to pay Defendant Miller after he killed Ms. Dunkley, and further providing evidence of Defendant Dunkley's motive. Mr. Sherrell testified that he knew that Defendant Dunkley and Ms. Frame were in a sexual relationship while he was married to Ms. Dunkley.

Additional evidence supporting Defendant Dunkley's conviction for conspiracy is evidence of his motive to have a shared life with Ms. Frame and his potential financial gain from Ms. Dunkley's death. The text messages provide direct and circumstantial evidence that an accord existed, however informal or unspoken, between Defendant Dunkley, Ms. Frame, and Defendant Miller to kill Ms. Dunkley, and that they acted with the purpose of promoting or facilitating her murder. Defendant Dunkley committed overt acts in furtherance of the offense, stating that Ms. Dunkley needed to be killed, providing information regarding her schedule and whereabouts, providing a gun, and contributing money to pay Defendant Miller. Accordingly, we conclude that the evidence was sufficient for a jury find beyond a reasonable doubt that Defendant Dunkley was guilty of conspiracy to commit first degree murder. Defendant Dunkley is not entitled to relief on this issue.

### 5. Sentencing

Defendant Dunkley lastly contends that the trial court erred when it applied three enhancement factors to his sentence: that Defendant Dunkley was a leader in the commission of the offense, that Defendant Dunkley had a previous criminal history, and that Defendant Dunkley abused a position of trust. *See* T.C.A. § 40-35-114, (1), (2) and (14) (2010). Defendant Dunkley asserts that the proof does not support the application of these enhancement factors. The State concedes that the application of the "position of trust" enhancement factor was improper in this case but contends that the application of a single enhancement factor is sufficient to justify an enhanced sentence, and that the evidence is sufficient to support the trial court's finding that Defendant Dunkley was a leader in the conspiracy and had a previous criminal history. We agree with the State that the "position

of trust" factor is not applicable here and that the evidence is sufficient to support the application of the remaining two enhancement factors.

The Tennessee Criminal Sentencing Reform Act of 1989 and its amendments describe the process for determining the appropriate length of a defendant's sentence and the manner of service of that sentence. In *State v. Bise*, the Tennessee Supreme Court reviewed changes in sentencing law and the impact on appellate review of sentencing decisions. 380 S.W.3d 682 (Tenn. 2012). The Tennessee Supreme Court announced that "sentences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" *Id.* A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)). To find an abuse of discretion, the record must be void of any substantial evidence that would support the trial court's decision. *Id.*; *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978); *State v. Delp*, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980). The reviewing court should uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10. So long as the trial court sentences within the appropriate range and properly applies the purposes and principles of the Sentencing Act, its decision will be granted a presumption of reasonableness. *Id.* at 707. We are to also recognize that the defendant bears "the burden of demonstrating that the sentence is improper." *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

T.C.A. § 40-35-210(c) (2012).

Although the trial court should also consider enhancement and mitigating factors, the statutory enhancement factors are advisory only. *See* T.C.A. § 40-35-114 (2012); *see also*

*Bise*, 380 S.W.3d at 699 n.33, 704; *Carter*, 254 S.W.3d at 343. We note that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." *Carter*, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" *Id.* at 343. A trial court's "misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Bise*, 380 S.W.3d at 706. "[Appellate Courts are] bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." *Carter*, 254 S.W.3d at 346.

We disagree with Defendant Dunkley's contention that the trial court improperly applied the enhancement factors that Defendant Dunkley had a previous history of criminal behavior and that he was a leader in the commission of the offense. T.C.A. § 40-35-114(1), (2). At the sentencing hearing, the trial court found that, relative to enhancement factor (1), Defendant Dunkley had a previous criminal history of daily marijuana use, based on Ms. Dunkley's testimony, and that he had committed aggravated perjury and been held in contempt of court in civil divorce proceedings. Relative to enhancement factor (2), that Defendant Dunkley was the leader in the commission of this offense, the trial court made the following statement:

> [I]t takes, at least, one more person to be involved in – in a conspiracy; but [these] particular events (sic), involving this incident, involved multiple people, attempts to involve other people. . . ; and that [Defendant Dunkley was] . . . the person that would gain or benefit from the events of the conspiracy occurring and was the instigator in wanting his wife dead.

> [I]t was [Defendant] Dunkley, as I've stated, that would be the beneficiary, from a life insurance standpoint, from a divorce standpoint, of having this conspiracy consummated, that is Ms. [Dunkley] killed, and [Defendant Dunkley] was the one giving directions about where [Ms. Dunkley] was, her work schedule, camera, all that proof that we've heard about.

The evidence presented at trial and at the sentencing hearing established that Defendant Dunkley gave information and directions necessary to carry out the killing of his wife, and was the original instigator of the conspiracy. Testimony at the sentencing hearing was that Defendant Dunkley was a daily marijuana user. As such, the trial court did not abuse its discretion when it chose to apply the enhancement factors to Defendant Dunkley's

-27-

sentence. The trial court considered the relevant principles and sentenced Defendant Dunkley to a within range sentence. Therefore, Defendant Dunkley is not entitled to relief.

## B. Defendant Miller

### 1. Sufficiency of Evidence

Defendant Miller contends that the evidence was insufficient to support his convictions because "any rational trier of fact could not have found" him guilty beyond a reasonable doubt. He argues that he never formed the intent to kill or commit burglary, and thus, the essential elements of conspiracy to commit first degree murder, attempted first degree murder, and attempted aggravated burglary were not proven beyond a reasonable doubt. The State responds that Defendant Miller clearly conspired with Defendant Dunkley to kill Ms. Dunkley, and in furtherance of the conspiracy, Defendant Miller followed Ms. Dunkley and went to her apartment, and while there attempted to break down the apartment door with the intent to kill Ms. Dunkley inside. The State further argues that "nothing in the record suggests that [Defendant Miller] withdrew from the conspiracy by the time he participated" in the attempted burglary or the attempted murder. We agree with the State.

### a. First Degree Murder Convictions

First degree murder is the premeditated and intentional killing of another person. T.C.A. § 39-13-202(a)(1). A premeditated killing is one "done after the exercise of reflection and judgment." T.C.A. § 39-13-202(d). The element of premeditation is a question of fact for the jury. *State v. Davidson*, 121 S.W.3d 600, 614 (Tenn. 2003). Although the jury may not engage in speculation, it may infer premeditation from the manner and circumstances surrounding the killing. *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997). In *State v. Nichols*, 24 S.W.3d 297, 302 (Tenn. 2000), our supreme court delineated the following circumstances from which a jury may infer premeditation:

> Declarations by the defendant of an intent to kill, evidence of procurement of a weapon, the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, infliction of multiple wounds, preparation before the killing for concealment of the crime, destruction or secretion of evidence of the murder, and calmness immediately after the killing.

The jury may also infer premeditation from the establishment of a motive for the killing and the use of multiple weapons in succession. *State v. Leach*, 148 S.W.3d 42, 54 (Tenn. 2004).

-28-

### i. Conspiracy to Commit First Degree Murder

As we earlier stated, the offense of conspiracy is committed if two or more people, each having the culpable mental state required for the offense which is the object of the conspiracy and each acting for the purpose of promoting or facilitating commission of an offense, agree that one or more of them will engage in conduct which constitutes such offense. T.C.A. § 39-12-103(a) (2010). It is also required that "an overt act in pursuance of such conspiracy is alleged and proved to have been done by the person or by another with whom the person conspired." T.C.A. § 39-12-103(d) (2010).

The essential feature of the crime of conspiracy is the accord - the agreement to accomplish a criminal or unlawful act. *See State v. Pike*, 978 S.W.2d 904, 915 (Tenn.1998); *State v. Hodgkinson*, 778 S.W.2d 54, 58 (Tenn. Crim. App.1989). A formal agreement is not required, nor must it be expressed; it may, and often will be, proven by circumstantial evidence. *See Pike*, 978 S.W.2d at 915; *State v. Shropshire*, 874 S.W.2d 634, 641 (Tenn. Crim. App.1993); *State v. Gaylor*, 862 S.W.2d 546, 553 (Tenn. Crim. App.1992) ("[A] mutual implied understanding is sufficient, although not manifested by any formal words, or a written agreement"). "The unlawful confederation may be established by circumstantial evidence and the conduct of the parties in the execution of the criminal enterprise. Conspiracy implies concert of design and not participation in every detail of execution." *Randolph v. State*, 570 S.W.2d 869, 871 (Tenn. Crim. App.1978).

The evidence, viewed in the light most favorable to the State, proved that Defendant Dunkley initiated a conversation with Defendant Miller about killing Ms. Dunkley and gave Defendant Miller a weapon to use to kill Ms. Dunkley. Defendant Miller and Ms. Frame proceeded to follow Ms. Dunkley to her home and work for a period of several months, with the aid of information provided by Defendant Dunkley in his text messages to Ms. Frame. Defendant Miller and Ms. Frame went to Ms. Dunkley's apartment in the middle of the night, where Defendant Miller attempted to break down the door of the apartment with a sledgehammer with the intention to go inside and kill Ms. Dunkley. Ms. Dunkley testified that, the next morning, her front door would not open and so she called the police. The officer who responded to her call testified that it appeared that Ms. Dunkley's apartment door had been attacked with a sledgehammer.

Ms. Frame recalled that, in addition to providing multiple weapons to Defendant Miller, she and Defendant Dunkley paid him money that he demanded before the murder took place. A detective testified that he listened to a recorded jailhouse phone call, during which Ms. Frame asked Defendant Miller for the money back that he had already been paid. The evidence that Defendant Miller took weapons and money ahead of the planned killing, and followed Ms. Dunkley with Ms. Frame at Defendant Dunkley's direction, is evidence

from which a jury could conclude beyond a reasonable doubt that Defendant Miller was part of the conspiracy to kill Ms. Dunkley and that he took substantial steps in furtherance of this conspiracy. Defendant Miller is not entitled to relief on this issue.

### ii. Attempted First Degree Murder

A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense . . . [a]cts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part . . . ." T.C.A. § 39-12-101(a)(2) (2010). Restated, a conviction for attempted first degree murder requires proof that the defendant intended to kill the victim "after the exercise of reflection and judgment" and either intentionally engaged in the conduct constituting the offense, believed the conduct would cause the intended result without further conduct, or the conduct constitutes a substantial step toward the commission of the offense. T.C.A. § 39-13-202(d) (2010); *See* T.C.A. § 39-12-202(a)(1) (2010); T.C.A. § 39-12-101 (2010).

We conclude that the evidence, viewed in the light most favorable to the State, was sufficient for a rational trier of fact to find that Defendant Miller's conduct constituted a substantial step towards to killing of Ms. Dunkley, as evidenced by his taking a sledgehammer to her apartment and attempting to break down her door while she slept inside. Additionally, Defendant Miller accepted money and weapons to be used in the killing, and spent numerous hours following Ms. Dunkley. This is evidence from which a jury could find beyond a reasonable doubt that Defendant Miller was guilty of attempted first degree murder. Defendant Miller is not entitled to relief on this issue.

### b. Attempted Aggravated Burglary

As relevant here, aggravated burglary is the entry of a habitation without the effective consent of a property owner with intent to commit a felony, theft, or assault. *See* T.C.A. §§ 39-14-402(a)(1), -403(a) (2010). A habitation is any structure designed or adapted for the overnight accommodation of persons. *Id.* § 39-14-401(1)(A). The intent required for the offense of burglary may be established by circumstantial evidence. *Bollin v. State*, 486 S.W.2d 293, 296 (Tenn. Crim. App. 1972). "In the absence of an 'acceptable excuse,' a jury may reasonably and legitimately infer that by breaking and entering a building containing valuable property, a defendant intends to commit theft." *State v. Ingram*, 986 S.W.2d 598, 600 (Tenn. Crim. App. 1998) (citations omitted). "A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense . . . [a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." T.C.A. §

-30-

39-12-101(a)(3).

The evidence considered in the light most favorable to the State, shows that Defendant Miller went to Ms. Dunkley's apartment in the early in the morning, while she was asleep inside, and attempted to gain entry into her apartment in order to kill Ms. Dunkley by using a sledgehammer to break open the door. The next morning, Ms. Dunkley could not open her front door because of the damage, so she called the police. The officer who arrived at the scene testified that, in his view and based on his experience, the door had been attacked by a sledgehammer. A jury could infer from this evidence that Defendant Miller intended to gain entry into the apartment for the purpose of killing Ms. Dunkley once inside. The evidence was sufficient to support Defendant Miller's conviction, and thus, he is not entitled to relief on this issue.

## 2. Thirteenth Juror

Defendant Miller next contends that because no rational trier of fact could have concluded that the essential elements for the offenses charged were established, the trial court, as the thirteenth juror, should have "overturn[ed]" all three convictions. Defendant Miller cites to the insufficiency of evidence argument section of his brief in support of this contention, and makes no additional argument as to why the trial court failed in its role as thirteenth juror. Because we have previously concluded that the evidence was sufficient to support Defendant Miller's convictions, we further conclude that, in this regard, the trial court did not fail in its role as thirteenth juror. Defendant Miller is not entitled to relief on this issue.

## 3. Consecutive Sentencing

Defendant Miller lastly contends that the trial court erred when it ordered consecutive sentencing. He contends that the trial court erred when it applied the consecutive sentencing factor that he is a dangerous offender. The State responds that the trial court's application of the consecutive sentencing factor was supported by the evidence. We agree with the State.

The Tennessee Criminal Sentencing Reform Act of 1989 and its amendments describe the process for determining the appropriate length of a defendant's sentence. Under the Act, a trial court may impose a sentence within the applicable range as long as the imposed sentence is consistent with the Act's purposes and principles. T.C.A. § 40-35-210(c)(2), (d) (2010); *see State v. Carter*, 254 S.W.3d 335, 343 (Tenn. 2008).

In *State v. Bise*, the Tennessee Supreme Court announced that "sentences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of

discretion standard with a 'presumption of reasonableness.'" 380 S.W.3d 682, 708 (Tenn. 2012). A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)). To find an abuse of discretion, the record must be void of any substantial evidence that would support the trial court's decision. *Id*.; *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978); *State v. Delp*, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980). The reviewing court should uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise,* 380 S.W.3d at 709-10. In other words, so long as the trial court sentences within the appropriate range and properly applies the purposes and principles of the Sentencing Act, its decision will be granted a presumption of reasonableness. *Id.* at 707.

Tennessee Code Annotated section 40-35-115(b) provides that a trial court may order sentences to run consecutively if it finds any one of the statutory criteria by a preponderance of the evidence. As is relevant in this case, the trial court found the following criteria applicable:

> (4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high[.]

T.C.A. § 40-35-115(b)(4). The consecutive sentencing criteria are stated in the alternative; therefore, only one need exist to support the imposition of consecutive sentencing. *See id.*; *State v. Denise Dianne Brannigan*, No. E2011-00098-CCA-R3-CD, 2012 WL 2131111, at *19 (Tenn. Crim. App., at Knoxville, June 13, 2012), *no Tenn. R. App. P. 11 application filed*. The imposition of consecutive sentencing, however, is subject to the general sentencing principles that the overall sentence imposed "should be no greater than that deserved for the offense committed" and that it "should be the least severe measure necessary to achieve the purposes for which the sentence is imposed [.]" T.C.A. § 40-35-103(2), (4). We review a trial court's decision to impose consecutive sentences for an abuse of discretion with a presumption of reasonableness. *State v. James Allen Pollard*, –S.W.3d–, No. M2011-0032-SC-R11-CD (Tenn. Dec. 20, 2013).

In this case, the trial court found, "[t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." T.C.A. § 40-35-115(4) (2010). Our Supreme Court has noted that the "dangerous offender" category is the hardest and most subjective to apply. *State v. Lane*, 3 S.W.3d 456, 460 (Tenn. 1999). Consequently, our Supreme Court

in *State v. Wilkerson* held that "particular facts" must show the following in order to base consecutive sentencing on subsection 115(b)(4): (1) that an extended sentence is necessary to protect the public against further criminal conduct by the defendant; and (2) that the consecutive sentences reasonably relate to the severity of the offenses committed. 905 S.W.2d 933, 938-39 (Tenn. 1995); *see State v. Robinson*, 146 S.W.3d 469, 524 (Tenn. 2004). Further, *Wilkerson* instructs that the "dangerous offender" category should only be imposed if four factors are satisfied: (1) the Defendant's behavior indicated little or no regard for human life; (2) he did not hesitate to act when the risk to human life was high; (3) extended confinement is necessary to protect society; and (4) the total length of the sentence must reasonably relate to the conviction offenses. *State v. Imfeld*, 70 S.W.3d 698, 708 (Tenn.2002); *Wilkerson*, 905 S.W.2d at 939.

The trial court further found that consecutive sentencing was:

> [R]easonably related to the severity of the offense based upon the factual findings that [Defendant Miller's] involvement [in the conspiracy] began nearly a year prior to [his] arrest, [Defendant Miller's] providing of the weapon, and his only hesitation in committing the crime being because of his concern about not getting paid.

Our review of the record reflects that the trial court did not err when it ordered consecutive sentencing. The evidence presented that Defendant Miller possessed weapons and a sledgehammer with the intent to use them in a murder supports the trial court's application of the consecutive sentencing factor that Defendant Miller is a dangerous criminal. Accordingly, we conclude that the trial court did not abuse its discretion when it ordered consecutive sentencing. Defendant Miller is not entitled to relief on this issue.

### III. Conclusion

In accordance with the foregoing reasoning and authorities, the judgments of the trial court are affirmed.

_____
ROBERT W. WEDEMEYER, JUDGE